Today is Chartier v. Epps. Mr. Lemberg. Good to see you. It's a pleasure. I please the Court. My name is Sergei Lemberg. I represent Andy Chartier on this appeal, and I represent him below in the District Court. The disposition of the Federal claims in this case does not depend on who owed what to whom. That's certainly a question that came up in the litigation, and the breach of contract claim does rest on that. But that's not the question on the Fair Debt Collection Practices Act claim, and it's also not the question on the Fair Credit Reporting claim. How much money is at stake here? Well, the $2,869, number one. Statutory damages, number two. Actual damages, difference in the interest rate my client paid, difference in the price of the house that he bought. So we quantified those damages in District Court, but it's probably under $100. Legal fees and costs. Well, I can't tell from the record, and I think it's pretty important to understand, which state's law controls this litigation, Virginia, Ohio, Arizona, which one? You can't. You can't. Well, you must have contention. On the breach of contract claim, the law of the state where the defendant signed the contract controls, because that's the last act necessary to make the contract. Tell us what state controlled. I'm sorry, sir? Here. What's the state law that controls here? Arizona or Ohio. They couldn't figure out which. You, as the party here, have to have a position on it. Our position was Virginia law controls. You say Virginia? Yes. Okay. There you go. Got you. I think the defendant's position was different below. They said Arizona or Ohio. We said Virginia. We're fine with Virginia. Well, did this not apply Virginia law to the waiver issue? We would be fine with that. No. I mean, my point is that – He wants to know what he did. If waiver's an issue, and it obviously is, I don't see how in the world we can decide this case right now without knowing what was in Judge Mott's mind about the waiver issue. There's no analysis in there. So how can we – I would not differ with that position. I would not differ with that position. I can't tell. And if you can't tell, then we're on the same page. He didn't discuss the waiver issue, did he? He didn't discuss the Fair Declaration. He didn't discuss the waiver issue. He must have impliedly rejected it. He didn't discuss the Fair Declaration Practices Act issue. What do you think about that proposition? We had a meeting this morning talking about impliedly rejecting double jeopardy in a death penalty case. If a high court of a state can impliedly reject that kind of a claim, I guess Judge Mott can impliedly reject a waiver claim in a $2,800 case. But in that decision, in the discussion from earlier this morning, you read out from a North Carolina decision where the Supreme Court said, we're not deciding it. Well, this judge here is not telling us anything. I mean, the same holds true for the – Well, he said everybody agreed that they made a mistake in the contract on the amount. They put a two where they should have put an eight. It made $60 a month difference, right? That's what Judge Mott says. He says that the lawyers figured it out and they messed it up. This all goes to two lawyers who can't write a contract and get the numbers right. Well, this whole thing. He says I'm going to determine the intent of the parties by looking at the contemporaneous emails. He said that, didn't he? Again, we are reading into it, but I think what he was thinking is I'm going to determine the intent of the parties. These contemporaneous emails show what the agreement should have been, and that's what I'm going to hold because that must have been what it was. But guess what? Andy Chartier testified of deposition a half a dozen times. I thought the payment amount was $328.86. Mr. Epps in the email to my client demanding payment is saying payment amount should be $388.04. Greentree, in responding to his dispute, says $328.86. If you divide the $21,136 by $48, what's it come to? $21,136 plus $2,500 divided by $48 is $328.25 as Judge Hollander held. It's not $328.26. It's not $328.26. It's off a penny. Off a penny. Putting aside any de minimis argument there, what is your position on the breach of contract issue? It goes to the jury. My client has never been in breach. Hold on, hold on, hold on. I'm not sure you ever answered Judge Floyd's question a while ago. If there's this waiver issue, are we able to decide it without knowing what state's law applies? Is that a yes, a no? It's a no. So why should we send it back? I would invite you to. On that issue, and if it goes back, and all, I mean, it's not a big deal in the big scheme of things. I realize, look, it's federal court. People are suing each other for millions of dollars. Parties in a federal court case can agree to what state law applies. I'm not sure it really made a difference here. Usually it doesn't make a difference. But we can have the state law issue. You all can, if you say Virginia, he can say Virginia, too. Well, here's where it does make a difference, Ditch King. On the waiver. We also have a, there's a substantiality doctrine in the federal system, too, that the federal courts handle federal cases. And there have to be substantial issues involved. And the insubstantial issues are not for the federal court system. Well. This kind of a case, when I started practicing law in West Virginia, would have been the JP court. Justice of the people. That's what we called it then, justice of the people. These are substantial issues to my client. But, Judge. I'm not so reflexive on your client or you or anybody. You're arguing about $2,800. That's a, you're suggesting $60 a month where the lawyer's messed up a contract. You go to the Justice of the people court. The Russell versus Equifax case was over $500. The Powell case is. There's no reason to be here about this. This is not class action. No, these were not class actions. This is not going to be a class action. No. This is an individual case. I mean, I do fair death class actions. This isn't it. McLaughlin versus, I'm sorry, McLaughlin versus Phelan out of Third Circuit. That was over the difference between $650 and $440. $210. These are federal laws. We had one here, a case called Laverne, I think it is, versus Edwards. Henrico School System. Judge Agee stayed here. But the coach threw the boys at the junior high school, threw the boys' father out of basketball practice. They had a constitutional claim. We said that the insubstantiality doctrine applied. Federal courts ought to have better things to do. And we dismissed it. We dismissed it. Decided to let the coach and the principal run the basketball practice. Didn't amount to very much. I mean, we got a lot of cases around here that are really important. Death penalty cases and things like that, as you saw here this morning. Is your waiver, is it contract modification by subsequent performance? Is that your waiver argument? Yes. Judge, the thing I want to tell you, I do a lot of this work. I think it's important. The statute has been around since 1978 without amendment. There's the Federal Debt Collection Practices Act. The FCRA has been around for decades and decades without much amendment. These are important rights that Congress gave people. I think they're important now. In my practice, I can tell you, we do hundreds and hundreds of these. Very, very few of them, I mean, I don't file summary judgment motions. I mean, we go quarters of a year without filing a motion. Cases like this get litigated because parties really are, I mean, they're rare. In my practice, at least, and I have for years filed most of these cases in the country. So the reason this is before you is because there is just a very fundamental disagreement on what's right and what's wrong, and the disagreement was not adjudicated. Is there a disagreement on whether it should be 28 or 88? The disagreement is on whether the Federal Debt Collection Practices Act was violated. Because, look, at the time that they were demanding this money. Judge Mott said that the lawyer representing the plaintiff testified that the 328 was simply an error. That was one piece of testimony. It was agreed to be 388. They wrote it down wrong. It's a clerical error. I mean, if they make a clerical error in a name or in a lawsuit or an indictment, they fix it. There was two answers to that. First of all, the lawyer qualified his testimony, and then he said based on these e-mails, and he specifically said that he did not participate in the discussions between my client and Mr. Epps. So you say Judge Mott misstated it there in his memorandum? Well, he just didn't state the qualifications that the lawyer specifically applied to those pieces of testimony. But the second more fundamental question is your ---- Well, let me ask you this. When Judge Mott says that the amount should be the $388.26, is he making a factual finding? Yes. So we would have to determine, assuming we can decide to breach a contract issue, whether or not that was clearly erroneous. Well, it's certainly erroneous based on the e-mail, on the letter from Greentree, which says that the payment amount should be $328.86. It's directly contradictory to Greentree's position in response to my client's dispute. He says the correspondence between the lawyers prior to the execution agreement reflected that it was to be $388 a month. Okay. And the lawyer for the plaintiff at deposition agreed that the $328 was an error. Based on the e-mail. And he qualified that he did not participate in the discussions under direct communications between my client and Mr. Epps. Now, Judge, here's the rub here. And I think my three-year-old taught me this. But he's right. What do you do when you make a mistake? What do you do when you goof up? You acknowledge the mistake. It's your recollection it should have been $388. That's the question I was asking at the deposition. The answer, yes, that is correct. That's at page JA-273. I was looking for those portions of the transcript. But the last time I negotiated with the last time, this is at page 14 of his deposition, the record JA-272. The last time I negotiated with Epps, yes, I was not there to see if there was any negotiation between my former client and Mr. Epps in person when he went to his office to sign. Nor was he there on the telephone when my client was talking to Epps before he was ever retained. That testimony was qualified and it was only based on the e-mail exchange. Now, and even if you can take the testimony of the lawyers to mean what to determine the intent of the parties, you can't take that testimony to the exclusion of all other evidence. Well, the lawyer is speaking for his client. He bonds his client. Sure. That's what lawyers do. Okay. Well, let's apply that principle to Greentree. And after what you read on page 273, he says, we've asked about $388. He said, yes, that is correct. That's words from his mouth. $388 is correct. That $388.86 is what he negotiated with Epps. No question. No question. But what do you do if you made a mistake? What is fair in that situation? That's the Russell versus Equifax decision. That's the Powell decision. That's the BB&T decision from this court. You know, in that case, the car, you know, the problem was on the bank. The fellow was going to the bank to make the payments. So even if accepting the payment should have been that, my client was never defaulted on the agreement. Not for one day ever was he ever in default. During the litigation, he was transmitting money into my escrow account. We are obligated to hold disputed funds in escrow under Connecticut rules. Virginia rules, I'm sure, too. He has never once defaulted. Calling him in default was a violation of the FDCPA and the FCRA. But the question is, is Judge Motz's order, as we have it before us, sufficient to get you relief? Because you've got to have the waiver in order to have a debt established in order for you to bring your federal claims, don't you? No. The federal claims do not rest on the disposition of the contract claim. Even if ultimately the jury finds that my client owed $2,800, we are entitled to judgment on the FDCPA claim on remand because at the time they threatened to sue him for the full amount of the debt as if he is in breach, they had no right to do it. Paragraph 5 of the agreement says, so long as you make payments, we will not sue. It doesn't talk about the settlement amount. It just talks about the payments. So long as payments are made, we will not sue. And what did they do? They threatened to sue him. They hired a lawyer. They called him in breach, not just for the $2,800, but for the entire $25,000. That's the FDCPA claim. And the reporting claims, they're discussed in the briefs, but I'm over my time. They can be disposed of on remand without any reference to the contract claim, which underlies the dispute. Thank you. You've saved some time for rebuttal. Thank you, Judge. Thank you. We'll see what Mr. Moffitt has to say about this. Good morning, judges. May it please the Court, Brian Moffitt on behalf of Green Tree Servicing, now known as DITAC. I'm going to address the arguments and claims as they relate to Green Tree. And when I'm done, my allotted time, Mr. Drams will address the claims and arguments that relate to his client, M. Richard Epps. Before I get into my argument, I want to address an issue that Judge Floyd asked a number of questions about, and that's the waiver argument. And I believe Judge Floyd questioned why or how did Judge Motz deal with the waiver argument. He didn't. And the reason he didn't, and I would ask the panel to scour the record on summary judgment, because when you do, you will not find any argument, any reference to any claim of waiver by Green Tree. The word waiver or waive is not even in Mr. Chartier's opposition to Green Tree's motion for summary judgment. He didn't raise the waiver argument when he opposed summary judgment. And because he didn't raise the waiver argument when he opposed summary judgment, Judge Motz didn't know it existed. Judge Motz didn't address it. And because he didn't raise it on summary judgment, it is not properly preserved for this Court to even address the issue. Now, what I will say, you're saying the waiver argument is a new argument raised for the first time here. It was raised for the first time in opposition to Green Tree's motion to dismiss way back when, when the case was initiated in 2014. It wasn't decided. It wasn't referenced. Did the Court rule on it at that time? No. It basically said, if there's a waiver argument, that's for the jury. I'm sorry. Yeah, if there's a waiver argument, it's for the jury to decide. But the law in this circuit is very clear. You can't, if you're going to raise an argument, you have to do it in opposition to the motion for summary judgment. You can't say, oh, because I raised it in opposition to the motion to dismiss, Judge Motz should have somehow looked at the whole record in resolving the summary judgment motions and said, oh, Mr. Chartier didn't raise it in opposition to summary judgment, but because you raised it in the motion to dismiss, I should address that to a sponte. That's not what the law in this circuit requires. The law in this circuit requires. Do you have a case for that proposition? Yes, I do, Your Honor. There you go. Bear with me for a moment and I will. It is cited in Appley's brief at page 31 of the brief. There's two sites. The first is United States v. Evans at 404 F3D 227. It's a 2005 case. And that case stands for the proposition that a party who fails to raise an argument before the district court has waived it on appeal. And, Mr. Chartier? That's failing to raise an argument at all. That's not what you're arguing about here. This was raised on the motion to dismiss. Very good. Let's look at Estate of Weeks v. Advance Stores Co. That's 99 F Appendix 470. It's a 2004 decision. That's unpublished. It's unpublished. That's not precedent. That would not help you either. You don't have any authority for what you're arguing about as the law. Maybe you're right. Maybe that is the law or should be. But the two cases you cite don't help you. I acknowledge that it's unpublished. But as my research revealed, it is the only case in this circuit that addresses this issue. And I believe the rules do allow me to cite for that proposition. It's unpublished. Oh, you can cite it. Yeah, you definitely can cite it. You did. But under our precedent, unpublished cases are not precedent. So you can't stand up there and say that's the law of this circuit because it's not. I appreciate that, Your Honor. But then it goes back to, you know, Might be the law of every other circuit. You may be able to show us that. Mr. Chartier is claiming error in Judge Motz's opinion relative to a waiver argument that was never before Judge Motz. It was never raised. Well, I thought he did raise it in support of his own motion for summary judgment. He did not move for summary judgment as against Greentree. No, I agree with that. So, yeah, he might have raised it in connection with his motion for summary judgment against Mr. Epps. Yeah, I think that's right. But even if he did, okay, and if he did, that argument was not raised as to Greentree. So, therefore, it should not affect Judge Motz's decision on summary judgment as against Greentree. And what I will say is that Mr. Chartier continues to put forth this court that Greentree somehow confirmed the $328 reference. It didn't confirm it. What Mr. Chartier is referencing is Greentree's response to the dispute Mr. Chartier raised to the credit bureaus. And in that response, Greentree merely recites what the settlement agreement states. It doesn't say, as Mr. Lemberg has just repeated to this court, that the payment should have been. That letter does not say that. What it says is the settlement agreement states, and it continues to say what the settlement agreement provides. And the other point I would raise before I get into my argument, and I know I'm almost halfway through, is the panel had a number of questions about the negotiations that took place between counsel for Mr. Chartier and counsel for Greentree. I think it's very important that the panel understands the sequencing of the negotiations, because what actually happened was that Mr. Chartier engaged in a series of negotiations with Mr. Epps. Those negotiations resulted in Mr. Chartier offering $7,000, $9,500, $12,500 to try to resolve the matter. Each of those offers was rejected because Greentree insisted on receiving 50% of the debt, $21,000. The debt was $42,000? It was $42,000. So the $21,000 or whatever was 50% of it? It was 50% of it. So he got the benefit of 50% reduction? And to be candid with you, Your Honor, he even got more than that, because he was able to sell his house in a short sale, because Greentree consented to taking a secured loan and making it unsecured. So he's getting a lot of benefits along the way. But what I would say is once Mr. Chartier engages Mr. Jacks, his attorney, no more communications took place between Mr. Chartier and Mr. Epps. All negotiations. And the evidence is clear on this point. All the evidence shows that negotiations took place between Mr. Chartier's attorney and Epps. And those negotiations are what caused the settlement agreement to be reached. And that attorney was Justin Jacks? Correct. Correct. So regardless of what Mr. Chartier may have discussed with Mr. Epps before engaging Mr. Jacks, those discussions never resulted in the settlement agreement that we're talking about today. And as it relates to the typo, I would submit that, Your Honors, All the stuff you're telling us is in this record? That is correct, Your Honor. And I believe if you look at Appellee's Brief, we have citations to every record, everything that I'm saying in the joint record extract. I would also say that the Court is certainly able to resolve the ambiguity created in the settlement agreement between the monthly payment amount because I believe that the evidence is undisputed. This Court can look at the extrinsic evidence, and that evidence is dispositive of the interpretive issue before the Court, and that allows the District Court to resolve the issue in summary judgment, and it also allows this Court to resolve the issue on summary judgment. This is to the breach of contract? And it's to the Fair Credit Reporting Act because the Fair Credit Reporting Act claim against Greentree is premised on this idea that he disputed Greentree's reporting of the information because he believed his credit report should show that the debt was paid because he satisfied the debt. If he didn't satisfy the debt, there's nothing incorrect in his credit report. Why didn't you all say he was in default? Greentree never said he was in default. He was sitting on that side of the table. I don't believe Greentree ever reported he was in default. He made the payments at the amount that was written down, and then he said he was in default. Well, let's look at that. He may have made the payments that were written down. He didn't pay $21,136. There's no dispute that the settlement required the payment of $21,136. And he agreed to pay $2,500 as a down payment. Correct. Did he pay that? He did. And he agreed to pay 48 monthly payments of $328.26. He did, but those payments do not equal the settlement amount. And then the 28 should be 88 because the lawyers messed it up. That was his fault. That was not his fault. If you disregard the fact that his lawyer messed up, he was sort of a bystander to this. He made what everybody wrote down to prove. He agreed to pay $21,136. He didn't pay that amount. And he wants us to write off the $2,800. That's what it is. It's a JP claim. And I would commit to your honor. But the fact of the matter is he's not really overly culpable in all this. His lawyer messed it all up. And you all messed it up because you agreed to the $328. Let me respond in two ways. You all wrote down the $328, too. Some other lawyer wrote it, right? Correct. Was that you? No, it was not me. Whose lawyer was it? It was Mr. Epps. Well, it was Green Tee's attorney at Collection County. Green Tee's attorney wrote the $328 down. And Justin Jackson signed off on it. Or didn't say anything about it. Correct. They messed up. It's two incompetent or ineffective lawyers that got this to here. That's correct. I'm not so sure that that allowed it. And the parties to both sides are victims of these lawyers messing up. It's an embarrassment to the legal profession. And I would submit to your honor. They bring up here a $2,800 case. I see I'm out of it. I know you're out of time like everybody else here this morning. But whose law do you think applies? I believe that potentially three states' laws apply. But I would submit to your honors that because the laws in those three states do not differ, this court does not have to resolve it. Why can't you just give us a straight answer and say that Virginia law is okay with you? In this instance, relative to the contractual interpretation claim, I don't believe if this panel wants to resolve it based on Virginia law, I don't believe that law differs from Arizona or Ohio law. I'm just trying to see if the parties will agree what law applies. And you won't. Okay. That may endure to your detriment that you can't agree. I would ask that the court simply affirm Judge Motz's ruling on summary judgment. Thank you, sir. Thank you. Appreciate it very much. Mr. Drame? May it please the Court? I'm Bob Drame for Appellee Richard Epps. I'm fine with Virginia law for the record. I'd like right away to say that Mr. Chartier did make 48 payments. He made 48 payments, each in the amount of the 328. Initially, he made 31 payments in that amount. He brought a whole bunch of them in at one time. That's right. He brought 17 checks in on July 29, 2013. That obviously seemed peculiar, I'm sure, to Mr. Epps. And so it was that very day that he wrote that first email to Mr. Chartier, pointing out the typographical error, acknowledging that it was his typographical error. So was he ever in default? He was not in default, and he was never declared in default, even after he brought in those 17 checks on July 29, 2013, in those communications, including the email of that day. And subsequently, Mr. Epps didn't use the word default, didn't say he was in default. He said what was that he still owed almost $3,000 on the settlement amount, and he said that was due, but he never actually said you are in default. Is waiver an issue in this case? I'm sorry, Your Honor? Is waiver an issue in this case? Well, that was never actually even raised to Mr. Epps. And as to whether or not Mr. Chartier may have waived, that wasn't really an issue one way or the other before Judge Mott's waiver as to Mr. Epps. But, Judge King, with respect to your question to Mr. Lambert, you're exactly right. Mr. Chartier hired an attorney to represent him. That's what attorneys do. There was communication in the negotiation, as Mr. Moffitt explained. Before Mr. Chartier retained counsel, he negotiated directly with Mr. Epps, but it didn't go anywhere. It didn't result in agreement. He was suggesting at one point, ironically, that there was a figure of $328 monthly going towards a much smaller total settlement amount. That was rejected. That was not accepted. That wasn't the deal. He then retained Mr. Jacks as his counsel. And, Judge King, as you point out, Mr. Jacks, in his deposition testimony, because this was on cross motions for summary judgment at the end of discovery, he testified, Mr. Jacks testified unequivocally that he had the permission and authority of his client, Mr. Chartier, to settle on those terms. Of course, the overriding term, the settlement amount, $21,136, paid in two ways. A down payment of $2,500 and installments totaling $18,636. And, by the way, that's in the settlement agreement, and so those two numbers are correct, and they add up to the settlement amount of $21,136. And so Mr. Jacks testified that those were the terms, including the $388 a month, because that's the only number that will get you to the other numbers, that Mr. Chartier agreed to those terms. Mr. Jacks says he would not have accepted, to Mr. Epps, he would not have accepted without his client's permission and authority. And he agreed that the $328 number that ended up in the settlement agreement was wrong. It should be $388. He didn't clarify, he didn't qualify. That's unequivocal and obviously supports summary judgment. Mr. Chartier obviously is trying to take advantage of that typographical error and pay even less than the settlement amount, which, of course, is 50% of his original indebtedness. Typographical error made by whom? Well, the typographical error was made by Mr. Epps. There's no question about that. He acknowledged it the very day he discovered it. But the fact that he made a typographical error doesn't mean that he violated the Fair Debt Collection Practices Act because he did not, as Judge Motz correctly determined. Well, let me ask you a question about that. Mr. Epps wrote a letter to Chartier on February the 4th, 2014, and part of that says, be advised that the sum of the $2,800 in change is not forthcoming. Legal action will be initiated. As I understand it, that's about a year and a half before the final installment was due under the settlement agreement, which he'd already paid all the installments. So what are we to make of that declaration from Mr. Epps? Well, that's a good question. We have to put it all in context, and that is that it had been some number of months since the July 2013 email when Mr. Epps alerted him to the typographical error and that the amount paid, in effect, was not the settlement amount, that there was almost $3,000 still owing. So Mr. Chartier ignores that email completely, and a number of months go by, and Mr. Epps then writes this February 4th, 2014, letter. At that point, there appears to have been an anticipatory breach, certainly an indication that Mr. Chartier may well, in effect, be taking advantage of that typographical error and not planning to make any further payments. But that's what Mr. Epps is trying to flush out. He doesn't say, again, he doesn't say that it's in default as of that moment. He doesn't say anything is overdue. And again, he's asking him, are you going to pay it? He says, if the sum is not forthcoming, he doesn't say by a certain date, and he doesn't say it has to be tomorrow or the next week or even the next month, then legal action will be initiated. I think he's just stating the obvious that if Mr. Epps is going to take the position and try to rely on that typo and not pay the agreed settlement amount of the $21,000, then there is the shortage and it's going to have to be resolved in the courts. I think that's a perfectly appropriate statement for him to make. Again, he didn't say that you're in default. And because he's not in default, he's not saying that any provisions, default provisions might apply if there's a default interest rate, for example, or any other penalties. He's not saying that he's legally in default. He's just trying to flush out his position as to whether that's going to be paid and indicating that it will end up in court if his position is he refuses to pay. And so none of those communications actually say that he's in default or subject to any default penalties. Of course, Mr. Cartier himself ends up on March 29, 2014, sending an email where he falsely starts out by saying that Mr. Epps agreed to the 328 figure and says, I remember this very clearly. Well, it's just patently false, again, getting back to the testimony of his attorney, who was the one who negotiated the settlement, including the $21,000 settlement amount and the $388 monthly figure. So given these undisputed facts, Judge Mott's correctly granted summary judgment, it is not a fair debt claim. It obviously is over a typo and a de minimis issue that does not rise to a fair debt claim. It's clear that Mr. Cartier agreed to a settlement amount, that he didn't pay it, and that Mr. Epps was communicating, acknowledging that the typo was his, and flushing out what Mr. Cartier's position was as to whether he was going to pay. Thank you. Thank you very much, Mr. Crain. Mr. Lindberg? Mr. Lindberg, on the waiver argument, our opposition said, argued that Grantree accepted Cartier's payments of 328.26 for nearly two years without raising an issue, and that, therefore, whether the agreement calls for payments of 328.26 or 388 cannot be decided on summary judgment. Now, I recall the discussion at the beginning of my brother's argument about waiver and Fourth Circuit case law on that. The case, one of the cases, this Court's case that talks about waiver, says that if the legal or factual bases for the claim are not in the papers, they're waived. Here, you have, number one, Judge Hollander, the initial initiation of the case, ruling that the issue is for the jury, and, number two, the factual basis for the waiver argument in the papers. They were not waived under this Circuit's precedent. That's number one. Number two, I want to talk a little about the February 4th and February 10th communications. The issue is not what they are. This Circuit's law requires that the communications from the debt collector be interpreted based on the standard of what the least sophisticated consumer would understand them to mean. And I submit to the panel that the least sophisticated consumer would understand, reading the letter from Attorney Epps, that he has broken the agreement, which is going to result in him being sued, unless he pays now, for the full amount of the debt. That's what the letter means. That's what it would mean to us. And if there's any question about what the letter means, I direct the Court to Appendix, Joint Appendix 158, the letter from the Cone Law Firm in Maryland, which my client received a month and a half later, telling him that he will be sued unless he pays $25,000, demanding $25,000. So that's an open and shut FDCPA case. You are demanding more money than is due. You're making false statements about the amount and character of the debt under this Court's Russell and Powell decisions, and it's a false threat of suit under 1692E10, under this Court's now three-decade-old national financial services decision. Now, there was also some suggestion that Andy was trying to pull a fast one and take advantage of Green Tree. I will direct, in response to that suggestion, the panel to Joint Appendix 222, which has an offer from Green Tree to settle the debt for $14,150, which he did not, to his regret, accept. But ultimately, they were at all times, well, at least before they hired Mr. Epps, they were certainly willing to resolve the debt for 25 percent less than he ultimately paid them before they threatened to sue him. And, Judge King, the FCRA claim, I think you picked it right up. He made the payments specified in the agreement. The record shows the entire time, the entire time, they were disputing this debt as charged off, and that's the worst possible designation under this Court's, I believe, in Johnson, that's where this was held to be. Charged off debt. They're not giving him any benefit of the payments, which he is timely making ahead of time. They are not, except for four months, reporting the debt as disputed. When he disputes, what response does he get? Yeah, absolutely right. 48 payments of 328.26 by the 15th of each month, or the settlement amount. That's what we understand the agreement to mean. Now, that's what's going on here. Now, what's the truth? Truth is, the guy's paid up under his reading of the agreement, fair and square. Maybe he's right, maybe he's wrong. But the reporting by Greentree creates a materially misleading credit report, which injured my client. And that is the following, its failure to reinvestigate the dispute, because they admitted that they didn't look at the payments. They admitted that they didn't calculate how much he had paid. And the response was directly contrary to what they're claiming in this litigation. They're saying, it was always clear that it was 388.26. Okay, fine. That's a position. That gets you off the hook on the breach of contract claim. But if it was so clear, how come you didn't figure it out when my client sent you a letter, which federal law allows him to do, and federal law mandates that you reinvestigate? And what they did was the exact opposite. They said 328.26. I thank the court for its attention. We appreciate it. This is admittedly a small case. We'll come down and greet counsel and adjourn court until 8.30 tomorrow morning. The honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, G. Steven Agee, Henry F. Floyd